IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Craig B. Stoneburner; 2715 Millwood LLC; 2731 Millwood LLC; 1105 Fairview LLC; 1107 Fairview LLC; 1921 Barnwell LLC; 1923 Barnwell LLC; 1925 Barnwell LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> Jerry L. Thompson; Timothy C. Ryan; Matthew Lam; Fredrick M. Delk; Marc S. Mylott; and City of Columbia, <br><br> Defendants. | C/A No. 3:12-cv-3551-JFA <br><br><br><br><br><br> **ORDER** |

**I.   INTRODUCTION**

This matter comes before the court on Defendants' Motions for Summary Judgment in this action alleging that the City of Columbia has, for about twenty years, selectively enforced certain regulations, in an effort to stifle the existence of halfway houses, in violation of federal and state law. Craig B. Stoneburner, the sole owner of various LLCs named after the residential and commercial properties at issue, brings this action on behalf of himself and the LLCs (collectively, "Plaintiffs") against the City of Columbia ("City") and city officials and employees ("Individual Defendants") (collectively, "Defendants."). The court has held two extensive hearings on this motion, and, upon the court's request,[1] received additional briefing from Plaintiffs. For the reasons given below, the court grants Defendants' motions in their entirety.

---

[1] The court requested Plaintiffs to file a brief of 35 pages or less, according to local rules, and to provide a top ten list of worst things done to Plaintiffs by the City. Plaintiffs exceeded the page limit, and declined to provide the court a top ten list, urging the court to look at the entirety of the circumstances.

1

Plaintiffs assert the following causes of action against the following Defendants:

| Defendant(s) | Causes of Action |
| --- | --- |
| Thompson[2], Ryan[3], Mylott[4] | Abuse of Process, Malicious Prosecution, Civil Conspiracy, Fair Housing Act |
| Lam[5], Delk[6] | Civil Conspiracy, Fair Housing Act |
| City of Columbia | Fair Housing Act, § 1983 |

Both the City and the Individual Defendants, through separate counsel and motions, move for summary judgment on all claims.

## II.     FACTUAL AND PROCEDURAL HISTORY

The facts recited herein are viewed in the light most favorable to Plaintiffs. Most of Plaintiffs' properties are leased as recovery houses or halfway houses for recovering alcoholics and drug addicts. Some of the residents have been previously incarcerated, and some continue to have trouble with the law. Although the exact use of each property has varied over time, the Millwood properties have been leased mostly to the "Cambridge House," a non-profit with the aim of rehabilitating its residents. The Fairview properties have served as overflow housing for the Cambridge House when the Millwood properties were at full occupancy. One of the properties, 2731 Millwood, is a commercial property that has been mostly vacant for the last twenty years.

The city alleges that its involvement with the properties was triggered either by construction and renovation projects, or from code violations. Plaintiffs, on the other hand, see discriminatory citizen complaints as motivating the City's enforcement actions. One Defendant, Fred Delk, is a resident of the neighborhood surrounding the properties and the Executive

---

[2] Jerry Thompson is a Building Official for the City of Columbia.
[3] Tim Ryan is a Building Inspector for the City of Columbia.
[4] Marc Mylott, who left the City of Columbia in 2010, was the previous Director of Development Services for the City of Columbia, which includes the Building Department.
[5] Matt Lam was a Deputy Fire Marshall / Fire Investigator for the City of Columbia.
[6] Fred Delk is the Executive Director of the Columbia Development Corporation. Delk is also a resident of the neighborhood where the properties at issue are located.

Director of the Columbia Development Corporation.[7]  Mr. Delk voiced his concerns about the group homes in the neighborhood to the City, and offered to purchase certain properties owned by Stoneburner.

Plaintiffs cite to several other communications, internally, as well as between City of Columbia officials and various neighborhood advocates, wherein there is discussion about the negative effect that the group homes have on the property values of homes in the adjoining areas and the negative social effects of the group homes on the adjoining areas.[8]  Plaintiffs use these letters to support their claim that the city practiced an unofficial "'get Stoneburner' or 'battle with Stoneburner' policy, coupled with a 'shut down the group homes' policy."  ECF No. 59, p. 47.  Plaintiffs claim that this policy has been in effect for about twenty years, presenting an enormous amount of evidence in opposition to the present motions.  The court, therefore, summarizes the evidence over the entire period and provides what it believes to be the most relevant instances of alleged misconduct by Defendants.

In July 2, 2008, Stoneburner was served three summonses, all related to alleged licensing and code violations.  One of the summonses related to the failure of Plaintiffs to have a licensed contractor supervise renovations of fire damage at one of the properties.  Tim Ryan did, however, issue a license for the renovations to a Mr. Howell.  According to Mr. Ryan, Mr. Howell cancelled the license because Plaintiff Stoneburner used his own workers to perform the work.  Mr. Howell did not supervise those workers and some of those workers were Cambridge House residents.  This story is corroborated by a letter from Mr. Howell to Mr. Ryan.  Another one of the three Summonses pertained to a plumbing code violation and the last summons related to another licensing issue.  On August 12, 2008, Ryan issued a construction permit to a new

---

[7] Mr. Delk says his "job duties are related to economic development and the creation of public/private partnerships."
[8] The court sees no harm in citizens petitioning their government for a redress of grievances.  *See* U.S. CONST. amend. I.

3

contractor for the property at issue—the same day the request for a permit was submitted. In June 2009, a Certificate of Occupancy was issued for the property, after the construction was completed and passed inspection. About two months later, the three summonses were nol prossed and Stoneburner wrote a letter apologizing to Mr. Ryan and a building official, Jerry Thompson.

Next, Plaintiffs complain that, "in 2010," they were harassed when Defendant Lam "summon[ed] a big, red, City of Columbia fire truck … [to] make a spectacle by standing on the truck to view the roof" of one of Stoneburner's properties, in response to a complaint from Defendant Delk.[9] ECF No. 79, p. 24. Plaintiffs also say that Defendant Lam "callously and intimidatingly and disrespectfully barge[d] into the room of a female occupant who had some mental issues, and was still in her nightgown." *Id.* at 25. The record, however, shows that Lam was accompanied by a resident or property manager, with apparent authority to escort Lam throughout the property when the alleged barge-in occurred. ECF No. 49, p. 16-17.

On March 15, 2012, Lam responded to a complaint regarding the living conditions at Plaintiffs' properties. Lam issued Fire Department Inspection Reports at 1921, 1923, and 1925 Barnwell Street for various violations of the International Property Maintenance Code and the International Fire Code. The reports allowed for 20 days to cure the property code violations, and 30 days to cure the fire code violations. Fifty-six days later, Lam inspected the properties and determined that no action had been taken to remedy the violations. Lam then issued twelve summonses to Bonnie Scarborough, the manager of the Cambridge House. Ms. Scarborough pleaded guilty to three of the summonses (one at each property) and the remaining nine summonses were *nol prossed*.

---

[9] Apparently, Plaintiff's counsel wants the court to take Plaintiffs' word on this, because the citation following this quotation reads: "See Scarborough Depo., not in possession of Plaintiff's counsel."

### III. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered when a moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Summary judgment should be granted in those cases where it is clear that there remains no genuine dispute as to material fact and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trs. of Mayland Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir. 1992). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### IV. ANALYSIS

At the second hearing on this motion, the court asked Plaintiffs' counsel for all of the acts of any defendant after August 2, 2010—a relevant statute of limitations date. Plaintiffs and Defendants cited to three acts: (1) Lam's March 15, 2012 fire and building code reports citing violations and providing a period within which to achieve compliance; (2) the 12 summonses issued to Ms. Scarborough, 3 of which she pleaded guilty to, and 9 of which were *nol prossed*; and (3) a June 24, 2011 notice left at one of the properties from a zoning inspector requesting additional information regarding the status of the property as a "roominghouse/boardinghouse."[10]

    *i.    Federal Claims*

Plaintiffs have asserted claims under 42 U.S.C. § 1983 and the Fair Housing Act.

---

[10] *See* ECF No. 59-6, p.11.

*a. Fair Housing Act*

Pursuant to the Fair Housing Act ("FHA"), "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than *2 years after the occurrence or the termination of an alleged discriminatory housing practice*, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach." 42 U.S.C. § 3613 (emphasis added). The continuing tort theory, therefore, has been expressly adopted by the FHA. Thus, the occurrence of an alleged discriminatory housing practice prior to August 2, 2010 is outside of the applicable statute of limitations, unless one act that is a piece of the larger unlawful practice has occurred within the limitations period. The court, however, finds no wrongdoing by Defendants under the FHA within the limitations period. Therefore, there is no predicate for the continuing tort theory to revive actions that fall outside of the limitations period.

The FHA makes it unlawful:

> (f)(1) "To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
> (A) that buyer or renter,
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
> (C) any person associated with that buyer or renter.
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—
> (A) that person; or
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
> (C) any person associated with that person.

42 U.S.C. § 3604. Further, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or

on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. The Fourth Circuit has determined that clients of a provider of drug rehabilitation services meet the general definition of persons under "handicap" in the Fair Housing Act for purposes of determining whether a litigant's refusal to rent apartments to the provider for use in the treatment program constituted prohibited discrimination. *United States v. S. Mgmt. Corp.*, 955 F.2d 914 (4th Cir. 1992). Therefore, the court will assume that the tenants of certain properties owned by Plaintiffs[11] are handicapped for purposes of the FHA.

Factors for the court to consider in evaluating the viability of a discriminatory decision made by government officials include:

    (1) the discriminatory impact of the official action;
    (2) the historical background of the decision;
    (3) the "specific sequence of events leading up to the challenged decision;"
    (4) departures from the "normal procedural sequence,"
    (5) departures from normal substantive criteria; and
    (6) the legislative or administrative history of the decision.

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The historical background of the decision factor likely gives Plaintiffs the ability to present the entire twenty year back-story here, and therefore, the court considers those twenty years in making its determination under the FHA. Similarly, the "specific sequence of events leading up to the challenged decision" may allow Plaintiffs to argue more broadly than they would otherwise be allowed to argue under the two-year statute of limitations.

Looking to the long history cited and the totality of the circumstances, Plaintiffs argue that "[i]n the instant case, the discriminatory motive is palpable, and needs no test." ECF No. 79, p. 21. The court disagrees. The March 15, 2012 Reports request that the properties be brought

---

[11] Not all of the properties are used for housing of handicapped individuals.

in conformity with building and fire codes. Aside from the merit of the reports, the best evidence in the record that there actually were code violations is that failing to correct the code violations cited in those reports led to the issuance of 12 summonses. Three of those summonses resulted in a guilty plea (one for each property) by the Cambridge House manager, as part of a plea bargain. Finally, the June 24, 2011 notice left on the door of one of the properties was merely a request by a zoning inspector for someone to contact him regarding the "Roominghouse/Boardinghouse" status of the property. ECF No. 59-6, p.11. This does not rise to the level of coercion, intimidation, threats, or interference, nor does it show discrimination.

After considering all of the *Arlington Heights* factors, including the twenty-year historical background provided by Plaintiffs, the court concludes that no violation of the FHA occurred within the statute of limitations period, and therefore, dismisses Plaintiffs' FHA claim in its entirety. Even though the continuing tort theory does apply, there is no continuing tort upon which to base the FHA claim within the limitations period.

    b. *Section 1983*

Plaintiffs' cause of action pursuant to 42 U.S.C. § 1983, alleged only against the City fails. The City cannot be held liable for the acts of its employees under § 1983, and Plaintiffs are unable to establish an official policy—implicit or explicit—to "get Stoneburner" or "shut down the group homes." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). The record in this case could not convince any reasonable juror that the City established an official

policy to "get Stoneburner." Each action taken by the City against Stoneburner—over the last twenty years—is more easily seen as a legitimate enforcement action, and even if there was a discriminatory or improper animus in certain instances, certainly such actions do not rise to the level of an *official* policy to "get Stoneburner."

    ii.    *State Law Claims*

The South Carolina Tort Claims Act ("SCTCA") shortens the relevant statute of limitations period as to all common law tort claims to two years and is applicable here. *Parker v. Spartanburg Sanitary Sewer Dist.*, 362 S.C. 276, 280-81, 607 S.E.2d 711, 714 (S.C. Ct. App. 2005) ("The Tort Claims Act governs all tort claims against governmental entities and is the exclusive civil remedy available in an action against a governmental entity or its employees."); S.C. Code Ann. § 15-78-70. The court finds that all Defendants acted in the scope of their official duty, and that none of the Defendants' conduct constituted "actual fraud, actual malice, intent to harm, or a crime involving moral turpitude," so as to arguably take Defendants outside of the SCTCA's two year statute of limitations.[12] As discussed, the court finds that each action taken by Defendants was taken for legitimate enforcement purposes.[13] Because all actions here were taken by defendants in the scope of their employment with the City of Columbia, the SCTCA's two year statute of limitations governs. Therefore, as with the FHA claim, the relevant statute of limitations date is August 2, 2010: two years prior to the filing of the complaint. S.C. Code Ann. § 15-78-110.

Under the SCTCA, a "governmental entity is not liable for a loss resulting from: … "

---

[12] *Flateau v. Harrelson*, 355 S.C. 197, 584 S.E.2d 413 (S.C. Ct.App.2003) (SCTCA's "two-year statute of limitations applies even if the Board members acted outside the scope of their official duties or if their actions constituted fraud, actual malice, intent to cause harm, or a crime involving moral turpitude."); *but see also Smith v. City of Greenwood*, 2010 WL 2382479 (D.S.C. June 14, 2010) (Recognizing the limitations of the *Flateau* decision).

[13] To the extent that Defendant Delk acted outside of the scope of his official duty, the court finds that Delk, as a resident of the surrounding neighborhood, engaged in protected First Amendment activity, by petitioning his local government for a redress of grievances.

    (3) execution, enforcement, or implementation of the orders of any court or execution, enforcement, or lawful implementation of any process;
    (4) adoption, enforcement, or compliance with any law or failure to adopt or enforce any law, whether valid or invalid, including, but not limited to, any charter, provision, ordinance, resolution, rule, regulation, or written policies;
    (5) the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee; …
    (12) licensing powers or functions including, but not limited to, the issuance, denial, suspension, renewal, or revocation of or failure or refusal to issue, deny, suspend, renew, or revoke any permit, license, certificate, approval, registration, order, or similar authority except when the power or function is exercised in a grossly negligent manner;
    (13) regulatory inspection powers or functions, including failure to make an inspection, or making an inadequate or negligent inspection, of any property to determine whether the property complies with or violates any law, regulation, code, or ordinance or contains a hazard to health or safety[.]

S.C. Code Ann. § 15-78-60.

Although Plaintiffs argue that the continuing tort doctrine applies generally in South Carolina, the court can only locate law applying that doctrine in the context of nuisance law. *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 288, 543 S.E.2d 563, 567 (S.C. Ct. App. 2001) ('[I]f the injury to neighboring lands is caused by negligence, or if the cause is abatable, then there arises a continuing cause of action."). Indeed, if there is any discernible rule on the continuing tort doctrine in South Carolina, it is that the continuing tort doctrine is not generally applicable. *Harrison v. Bevilacqua*, 354 S.C. 129, 141, 580 S.E.2d 109, 115 (S.C. 2003) ("We decline to adopt the continuous treatment rule or the doctrine of continuing tort."); *Ins. Products Mktg., Inc. v. Conseco Life Ins. Co.*, 2012 WL 3308368 at *9 (D.S.C. Aug. 13, 2012) ("The South Carolina Supreme Court has refused to adopt the "continuing tort" doctrine in a medical malpractice claim governed by the South Carolina Tort. It is unclear whether such a theory could be applied to the type of claim presented here-a common law tort, rooted in property rights.") (citations omitted). However, because the court finds that no conduct within the limitations

period could revive prior state law claims, the court need not reach a determination of whether the continuing tort theory applies to the state law claims.

### a. Malicious Prosecution

The malicious prosecution claim must fail. The only proceeding within the limitations period upon which to possibly base the malicious prosecution claim is the May 10, 2012 issuance of 12 summonses to Ms. Scarborough. *Law v. S. Carolina Dep't of Corr.*, 368 S.C. 424, 435, 629 S.E.2d 642, 648 (S.C. 2006) ("[T]o maintain an action for malicious prosecution, a plaintiff must establish: (1) the institution or continuation of original judicial proceedings; (2) by or at the instance of the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage."). The plea bargain entered into by Ms. Scarborough—pleading guilty to 3 of the charges and having the remaining 9 *nol prossed*—leads the court to the conclusion that there necessarily was probable cause for the issuance of the summonses. Further, as discussed, the court finds that none of the Defendants acted with malice as to any action taken within the limitations period.

### b. Abuse of Process

"The two essential elements of an abuse of process claim are (1) an ulterior purpose, and (2) a willful act in the use of the process not proper in the conduct of the proceeding." *Argoe v. Three Rivers Behavioral Ctr. & Psychiatric Solutions*, 388 S.C. 394, 403 (S.C. 2010). "Some definite act or threat not authorized by the process or aimed at an object not legitimate in the use of the process is required." *Hainer v. Am. Med. Int'l, Inc.*, 328 S.C. 128, 136 (S.C. 1997). The actions taken within the limitations period here simply do not support a definite act or threat not authorized by the process used here. The March 15, 2012 Reports request that the properties be brought in conformity with building and fire codes. Requesting conformity with those codes is a

legitimate reason for issuing those reports. The May 10, 2012 summonses—which were partly pleaded guilty to and partly *nol prossed*—were likewise properly issued for legitimate building and fire code violations. Finally, the June 24, 2011 notice left on the door of one of the properties was merely a request by a zoning inspector for someone to contact him regarding the "Roominghouse/Boardinghouse" status of the property. ECF No. 59-6, p.11. Finding Defendants' actions related to any conceivable use of process within the limitations period to be legitimate, the court concludes that Plaintiffs' abuse of process claim must fail.

### c. Civil Conspiracy

"The elements of a civil conspiracy in South Carolina are (1) the combination of two or more people, (2) for the purpose of injuring the plaintiff, (3) which causes special damages." *Pye v. Estate of Fox*, 369 S.C. 555, 566-67 (S.C. 2006). "[I]n order to establish a conspiracy, evidence, direct or circumstantial, must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." *Island Car Wash, Inc. v. Norris*, 292 S.C. 595, 601, 358 S.E.2d 150, 153 (S.C. Ct. App.1987). As discussed already, there is no evidence that any defendant acted intentionally, for the purpose of injuring Plaintiffs. Nor is there sufficient evidence in the record showing an agreement or combination between any of the Defendants to withstand summary judgment. Plaintiffs' argument that there was an agreement to injure Plaintiffs boils down to an argument that there must have been an agreement to injure Plaintiffs. Defendants, on the other hand, have come forth with testimony from certain defendants that no conspiracy existed and that defendants Lam and Mylott in fact did not even know each other. ECF No. 52-1, p. 24. Therefore, the court finds that no reasonable juror could find a conspiracy on the record presented.

## V. CONCLUSION

For the reasons given, the court grants Defendants' respective motions for summary judgment (ECF Nos. 49, 52), and dismisses, *with prejudice*, all claims asserted against all Defendants.

IT IS SO ORDERED.

May 20, 2014  
Columbia, South Carolina

Joseph F. Anderson, Jr.  
United States District Judge